Filed 6/1/22  In re B.G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.G. et al., Persons Coming Under the Juvenile Court Law. | B312174 (Los Angeles County Super. Ct. No. 20CCJP04488A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CANDACE V., Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Marguerite Downing, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Candace V. (mother) appeals from a judgment of the juvenile court asserting jurisdiction over her four children, Aubrey V. (born May 2008); B.G. (born October 2009); M-S.G. (born June 2012); and M.G. (born December 2014). Mother challenges the juvenile court's order removing the children from her custody. Mother further argues that the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with the inquiry provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA).

We affirm the judgment and removal order.

### FACTUAL AND PROCEDURAL BACKGROUND

Aubrey's presumed father is Louis V. DeShawn G. (father) is the father of B.G., M-S.G., and M.G. Neither Louis V. nor father is a party to this appeal. At the time the dependency proceedings were initiated, all four children were living with mother and father in Chino, California.[1] The family was in Los Angeles visiting B.G., M-S.G., and M.G.'s paternal grandmother

---

[1] There was conflicting evidence in the record as to whether father was living with the family at the time the dependency proceedings commenced. Mother reported that she lived alone with the four children. However, M-S.G. reported during separate interviews that he and M.G. lived with mother, father, and their two sisters.

when the events that triggered the dependency petition occurred.[2]

**Referral, petition, and detention—M-S.G. and M.G.**

On August 25, 2020, DCFS received a referral alleging M-S.G. and M.G. were victims of severe neglect by mother. Los Angeles County Sheriff's Department (LASD) deputies observed a car driving on the wrong side of the road, run a red light, drive on the sidewalk, and almost run into a brick wall. The deputies found mother driving the car with M-S.G. and M.G. also inside. The deputies observed that mother was under the influence of "something." Mother refused to submit to a sobriety test. When it was determined the vehicle mother was driving was stolen, mother was arrested for the stolen vehicle, reckless driving, and child endangerment. M-S.G. and M.G. were taken into protective custody.

A DCFS social worker responded but was unable to speak with mother until after the booking process. M.G. told the social worker that he and his brother, M-S.G., were with their mother in the car, that they did not live in Los Angeles, but were visiting paternal grandmother so that she could buy them clothes. M.G. said they were supposed to go home, but mother had an accident, of which M.G. could not recall details because he was "mostly asleep and did not see anything."

M-S.G. said the family lives in Chino but had come to Los Angeles to do some shopping with his grandmother. M-S.G.

---

[2] We hereby grant DCFS's motion for judicial notice of postjudgment evidence, including minute orders reflecting that the matter was transferred to San Bernardino County, soon after the disposition hearing. The juvenile court in San Bernardino County now has jurisdiction of this matter.

provided the social worker with an address in Chino where the family lived.  M-S.G. stated that he lived with mother, father, M.G., and two sisters B.G. and Aubrey.  At first, M-S.G. denied that they had been in a car accident.  M-S.G. later said they had a small accident because mother must have stepped on the gas by mistake.  When asked about mother's drug use, M-S.G. reported that mother "smokes one blunt a month" but would smoke it outside the home.

During the interview, M.G. interrupted M-S.G. and said mother was "drunk."  M-S.G. immediately snapped at his brother in disagreement.  M.G. told the social worker that it was M-S.G. who earlier said mother was drunk, which M-S.G. denied.  The social worker asked M-S.G. if mother had been smoking a blunt or drank alcohol during this trip.  M-S.G. denied mother ever smoked a blunt or drinking alcohol.  When the social worker informed M-S.G. that the social worker would try to contact father, M-S.G. said he would rather go back with his mother and informed the social worker that his father was probably not home.

The social worker attempted to locate the address in Chino provided by M-S.G., but the address did not exist.  The social worker also tried to contact father at his last known telephone number but was unable to reach him.

On August 27, 2020, DCFS filed a petition on behalf of M-S.G. and M.G. pursuant to Welfare and Institutions Code section 300,[3] alleging in count b-1 that mother had placed the children in a detrimental and endangering situation by driving

---

[3]    All further unspecified statutory references are to the Welfare and Institutions Code.

4

recklessly while under the influence of a controlled substance with the children in the car.

At the September 2, 2020 detention hearing, mother provided a form ICWA-020 indicating she had no Indian ancestry. Under the heading, "Indian Status," mother checked the box indicating "None of the above apply." Father also provided a form ICWA-020, indicating "None of the above apply." Upon inquiry from the court, mother said father had no Indian ancestry. Based upon the mother's response, the court found no reason to know that ICWA applied or that the children were Indian children. The court found father to be the presumed father of M-S.G. and M.G.

The juvenile court found that DCFS had established a prima facie case that the children were described by section 300. The court detained the children from the mother and ordered them released to father.

On October 15, 2020, DCFS filed a first amended petition (FAP), which amended count b-1 to add that during the August 25, 2020 incident, the children were not secured in the car with seat belts. Count b-1 was further amended to add that mother had been arrested for grand theft of an auto.

The FAP further alleged in count b-2 that M-S.G. and M.G.'s father had an extensive criminal history including felony convictions for burglary, felon in possession of a firearm, possession of phencyclidine for sale, possession of marijuana for sale, and was a registered controlled substance offender. The FAP asserted that father's criminal history endangered the children's physical and emotional health, safety, and well-being.

On October 20, 2020, the juvenile court received the FAP and dismissed the original section 300 petition.

**Jurisdiction/disposition report**

In its November 5, 2020 jurisdiction/disposition report, DCFS reported that the children were residing with the maternal grandmother in San Bernardino, along with their siblings Aubrey V. and B.G.  Father left the children with maternal grandmother and was no longer willing to cooperate with DCFS's investigation.[4]

DCFS provided father's criminal history, which began in 1991 and included numerous arrests and convictions.  Father's criminal history included several convictions for possession of drugs for sale.  While father acknowledged his criminal history, he refused to talk about it further.  Father did not know anything about the August 25, 2020 incident involving mother.  He was not enrolled in any programs.

DCFS also provided the LASD report regarding mother's August 25, 2020 arrest, including that the deputies observed M-S.G. and M.G. disoriented and crying on the floorboard of the car mother was driving.  The children were not wearing seat belts, nor did they have appropriate child seats.  At the scene the deputies were approached by a woman, Tamika S., who identified herself as the owner of the car mother was driving.  Tamika S. reported that she observed mother and the children walking on Wilmington Avenue and stopped to offer them a ride.  While she was out of the vehicle assisting mother who was getting the children in the car, mother got in the car and drove off at a high rate of speed on El Segundo Boulevard.

---

[4]     There was an open child welfare investigation regarding Aubrey and B.G. as well.

M-S.G. reported having no recollection of what happened on the day of the accident. He only remembered falling asleep in the car and waking up at the LASD office.

Mother provided the DCFS investigator with a detailed story surrounding the car accident. She explained that she was visiting father's mother in Compton, after she agreed to give a ride to a friend, Eugene, who wanted to go to the Compton area. Once in Compton, mother went to Eugene's family home where she had one drink. She speculated her drink was spiked or laced with something because she started to lose her motor skills and had a vague recollection of things thereafter. Mother explained that she was followed by gang members after leaving Eugene's home. At a gas station they were followed by the same individuals, who began provoking Eugene. After she and the children got out, one of the men arguing with Eugene got in mother's car and drove off. Eugene ran after the car. Mother never saw him again. Then, some women started trouble with mother. They jumped mother, but one of the women had left her vehicle door open, so feeling threatened, mother got into the car and drove off. Mother stated she then began "blacking out," and had no recollection after that. Mother insisted that she never drove on a sidewalk and that the deputies contradicted themselves and never read her *Miranda*[5] rights after arresting her. Mother suggested it did not make sense for her to steal a car when she owned a brand new car.

Mother reported that since the accident, she had enrolled in a parenting program and was on a wait list for a substance abuse program and individual counseling at the same facility.

---

[5]     *Miranda v. Arizona* (1966) 384 U.S. 436.

**Second amended petition—M-S.G. and M.G.**

On November 19, 2020, DCFS filed a second amended petition (SAP), alleging in count b-3 that father left the children with the maternal grandmother without making a plan for the children's ongoing care and supervision.

Maternal grandmother informed DCFS that she had attempted to contact father since he dropped off the children at her home, to no avail. Father's whereabouts were unknown to DCFS.

**Section 300 petition and detention—Aubrey and B.G.**

On December 7, 2020 a section 300 petition was filed on behalf of Aubrey and B.G. The petition set forth the same allegations as the SAP filed on behalf of M-S.G. and M.G. B.G. and Aubrey were distraught about having to leave home. Mother expressed concern that the maternal grandmother was abusing the children. B.G. disclosed that maternal grandmother hit her with a belt about a month before, and Aubrey confirmed that it happened. The social worker agreed not to take B.G. and Aubrey to maternal grandmother's home. Aubrey and B.G. were placed together in a foster home, while M-S.G. and M.G. remained with maternal grandmother.

The accompanying detention report provided details regarding the family's prior child welfare history, including a case in San Bernardino in 2016. On August 6, 2016, the juvenile court sustained a petition that alleged father physically abused Aubrey by hitting her with a belt, leaving marks and bruises, and sexually abused her by making her place her tongue in his mouth while he touched her vagina. The petition further alleged that both mother's and father's marijuana use impaired their ability to safely parent and care for their children. The case was closed

in February 2017 with the children remaining in mother's custody.  The family's child welfare history also included a 2010 unfounded referral of caretaker absence and neglect by mother, and a 2015 referral with no disposition for Aubrey, stating that she showed her private parts to a group of students at school, at which time one student allegedly touched her vaginal area.

At the detention hearing for B.G. and Aubrey, mother filed a second ICWA-020 form claiming she did not have Indian ancestry.  Mother also confirmed that father did not have any Indian ancestry.  The juvenile court again found that ICWA did not apply to the case.  The court found a prima facie case that B.G. and Aubrey were children described by section 300 and detained them from the parents.

DCFS noted that the whereabouts of Aubrey's alleged father, Louis V., were unknown.

When DCFS attempted to interview mother and father about the allegations regarding Aubrey, mother refused to provide a statement and referred the social worker to her attorney.  Maternal grandmother reported that father had left the children in her custody, and she had been forced to take a leave of absence from work in order to care for the children.

The social worker interviewed Aubrey and B.G. about the allegations in the petition.  Aubrey related what she had heard from mother—that someone put something in mother's drink and mother's friend got into a fight.  Aubrey stated that mother did not drink alcohol "that much," but that she began drinking more when the COVID-19 pandemic began.  Aubrey also said mother used to smoke marijuana but no longer did so.

B.G. similarly reported that someone put something in mother's drink the day of the accident and that mother's friend

9

"got jumped." B.G. stated that mother drank alcohol "once in a while because it makes her sick afterwards." B.G. informed the social worker that mother was "addicted to weed." Mother "would get frustrated with my brothers and it would make her feel calmer when she smoked. She would smoke outside or in her bedroom or her bathroom." B.G. did not know where mother kept the weed.

Regarding services, mother had completed a "Parenting Skills Book Study Class" dated November 8, 2020, from LifeMatters.com. She also completed an eight-hour drug and alcohol awareness class on December 10, 2020. Mother had enrolled in therapy on November 24, 2020, and as of December 14, 2020, had participated in three sessions. Mother tested positive for marijuana on September 9, 2020, and was a no-show on September 25, 2020, October 14, 2020, October 26, 2020, and November 23, 2020. Mother tested negative on December 10, 2020.

**February 2021 last minute information for the court**

On February 4, 2021, DCFS provided last minute information for the court indicating that a heated argument took place between mother and maternal grandmother in the presence of the children. Due to the dispute, M-S.G. attempted to leave the home. Maternal grandmother had a history of domestic violence investigations with DCFS. Due to the argument, M-S.G. and M.G. were removed from maternal grandmother's home and placed with Ramona R.

**Jurisdiction/disposition hearing**

At the February 4, 2021 jurisdictional hearing, the juvenile court found Louis V. to be Aubrey's presumed father, based on similar findings made in San Bernardino County. The court

10

received the various reports and exhibits into evidence. Mother argued that this was a one-time incident and there was a lack of evidence of current risk of harm to the children. Mother argued that her missed tests were due to the fact that she lived out of the county and lack of communication with the social worker. Mother pointed out that she submitted three consecutive negative tests.

The children's counsel asked the court to sustain the counts related to mother's reckless driving and father's failure to make a proper plan for the children's care. Counsel argued for dismissal of the count related to father's criminal history. The court agreed with children's counsel and sustained counts b-1 (related to mother's reckless driving) and count b-3 (related to father's failure to make a proper plan for the children's care). The court continued the matter for disposition.

**First notice of appeal**

On March 10, 2021, mother filed a notice of appeal from the juvenile court's February 4, 2021 order.

**March 2021 and April 2021 last minute information for the court**

DCFS filed two subsequent updates for the court. On March 22, 2021, DCFS reported that in February 2021 Aubrey's presumed father, Louis V., contacted the DCFS investigator and provided additional information about the family's previous dependency case in San Bernardino County. According to Louis V., he attempted to keep his daughter safe when father was abusing her. However, during visitation, mother convinced Aubrey to retract what she had alleged regarding the sexual abuse by father. Louis V. stated that mother convinced Aubrey to say that Louis V. had hit her, so that mother could regain

11

custody. Louis V. expressed disappointment that mother chose to protect father instead of Aubrey.

Mother missed a drug test appointment in January 2021 but tested negative in February and March. Father's whereabouts remained unknown.

In a last minute information for the court filed April 6, 2021, DCFS reported that mother's criminal case was dismissed due to mother's compliance with an informal court-ordered diversion. Mother completed an eight-hour drug and alcohol awareness class, which was not an approved DCFS program. Mother failed to show for her drug test on March 18, 2021, but tested negative on March 19, 2021. Mother rescinded release of information from her therapist, so there was no confirmation of her treatment plan, nor could DCFS confirm mother's progress in demonstrating insight into child safety issues. On January 7, 2021, mother's therapist reported that mother had attended three sessions, but no progress could be reported due to lack of attendance. Mother cancelled her appointment on December 16, 2020, and did not attend on December 21 and 28, 2020. The therapist was unable to contact mother, as her voice mail box was full.

Father was arrested in San Bernardino on November 6, 2021, for being a felon in possession of a firearm. Father was incarcerated.

All four children had been placed together in the home of foster parent Ramona R. DCFS recommended that the matter be transferred to San Bernardino County after disposition.

**April 6, 2021 disposition hearing**

At the April 6, 2021 dispositional hearing the children's counsel noted that the children wanted to be home with mother.

12

The children's counsel pointed out that mother was attending a parenting class and had enrolled in Alcoholics Anonymous. Counsel acknowledged that mother's parenting and substance abuse treatment programs were not approved by DCFS but argued that mother understood that she needed to enroll in additional programs.

Mother's counsel argued that mother was being proactive, that there were measures in place to ensure the children's safety in mother's custody, and that it had been seven months since the accident.

DCFS argued that the children should be removed from mother, noting that the objectives of the dependency court and the criminal court were different, and the family's dependency history in San Bernardino was serious. Counsel observed that mother never acknowledged the safety risk she created for the children or provided explanations for the accident that did not show accountability for her actions. Mother also had tested positive for marijuana after dependency proceedings were begun and had missed many drug testing appointments.

The juvenile court declared the children dependents of the court, noted that mother had not yet accepted responsibility for her behavior and was not enrolled in any programs addressing child safety issues. The court found mother's limited participation in counseling was insufficient, removed the children from mother's custody and ordered family reunification services with monitored visitation.

**Second notice of appeal**

On April 13, 2021, mother filed a notice of appeal from the April 6, 2021 dispositional orders of the juvenile court.

**DISCUSSION**

Mother challenges the court's order removing the children from her custody. She also argues that a remand is necessary because DCFS and the juvenile court failed to properly discharge the duty of inquiry under ICWA. We address each contention separately below and conclude that mother has failed to show reversible error.

**I.    Removal order**

**A.    *Applicable law and standard of review***

Once jurisdiction is established, the juvenile court must determine the appropriate disposition for the child. The court is not limited to the content of the sustained petition when it considers what disposition would be best for the child. (*In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1183.) Additional social study reports, special evaluations, and "other relevant and material evidence" may be considered. (§ 358, subd. (b).) In determining whether a child may remain in the custody of a parent, the juvenile court may also consider "the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

To remove a child from parental custody under section 361, subdivision (c)(1), DCFS must prove by clear and convincing evidence that there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being, and no reasonable way to protect the child from these dangers in the parent's home. "This is a heightened standard of proof from the required preponderance of evidence standard for taking jurisdiction over a child." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*).) "Clear and

14

convincing evidence" has been defined as evidence requiring "a high probability, such that the evidence is so clear as to leave no substantial doubt."  (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 695.)  The heightened burden of proof is "'premised on the notion that keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1066-1067.)

"The standard of review of a dispositional order on appeal is the substantial evidence test."  (*Hailey T., supra*, 212 Cal.App.4th at p. 146.)  In assessing juvenile court error concerning removal of a child from a parent, we must apply the substantial evidence test "'bearing in mind the heightened burden of proof.'"  (*Ibid.*)  In other words, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)  At the same time, we still must "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

> **B.** ***Substantial evidence supports the juvenile court's order removing the children from mother***

Mother argues that substantial evidence did not support the juvenile court's determination that removal of the children from mother's custody was required.  Specifically, mother contends that the evidence did not show a current, substantial danger to the physical health and safety of the children in

mother's care or that there were no reasonable means to protect the children without removal.

We disagree. The juvenile court set forth in detail its rationale for removing the children from mother's care. While acknowledging that the criminal court assigned mother some "programming," the court noted that the criminal court was not concerned with the children's safety.[6] The court expressed its concern that mother did not attend any programs regarding drinking and driving or smoking and driving. In addition, mother did not have the children in seat belts at the time of the incident. Because the programs mother had completed for the criminal court did not address child safety or the actions of mother that endangered the children, the court found "the little bit of programs she has done is not sufficient."

The court further noted that mother did not take responsibility for her actions. Instead, mother insisted that someone put something in her drink. The juvenile court was not required to believe mother's version of the events leading up to mother's reckless driving and serious endangerment of her children. The juvenile court had before it ample evidence that mother had problems with substance abuse. Mother had a prior dependency case in 2016 originating in part due to substance abuse that interfered with mother's ability to parent her children. M.G. reported that mother was drunk at the time of the accident. Mother admitted to drinking but insisted that her drink was laced with an unknown substance. M-S.G. disclosed that mother used to smoke "blunts," and B.G. indicated that mother was

---

[6] The record shows that following her accident and arrest, mother completed a one-day, eight-hour drug and alcohol awareness class.

addicted to marijuana. Aubrey further noted that mother had started consuming more alcohol than usual during the pandemic. There was evidence that mother's substance use persisted during the pendency of the case, as mother tested positive for marijuana in September 2020 and missed several subsequent drug tests.[7] This evidence supported the juvenile court's determination that the brief class that mother attended was insufficient to ensure that mother would refrain from use of substances that could cause harm to her children. As the juvenile court noted, "[s]he could have killed these kids."

In addition, the court noted that mother never acknowledged her criminal behavior in stealing a car. Again, the court was not required to believe mother's story regarding the events leading up to the accident. Mother's failure to take responsibility for her reckless behavior presented a substantial danger to the children's safety and well-being. Mother's failure to acknowledge or address her behavior constituted evidence that the danger to the children's safety is ongoing.

Finally, not only had mother failed to complete any programs that addressed the children's safety, mother revoked her release of therapeutic information to the social worker. Thus, the social worker had no way of knowing how mother's treatment was progressing. Mother's unwillingness to cooperate with the social worker and DCFS, or keep them apprised of her progress, prevented the court from being able to declare that there was no present danger to the children. Instead, the evidence and circumstances supported the juvenile court's decision that there

---

[7] The juvenile court may properly consider missed drug tests as positive tests. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217.)

17

remained a substantial danger to the children if they remained in mother's care and that no reasonable alternatives to removal existed.

Mother argues that the juvenile court's emphasis on mother's acceptance of responsibility was wrong, as the juvenile court intervenes to protect a child, not punish a parent. (Citing *In re Malinda S.* (1990) 51 Cal.3d 368, 384, superseded by statute as stated in *People v. Otto* (2001) 26 Cal.4th 200, 207, and quoted in *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233.) While it is true that the court's intervention is to protect the child, the parent's acknowledgement of her behavior is a significant step towards the safety of the child. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) The court did not err in considering mother's "response to the conditions that gave rise to juvenile court intervention." (*In re D.B., supra*, 26 Cal.App.5th at p. 332.)

Mother further argues that there was no past physical harm to the children, thus any risk of future harm to the children was merely speculative. Mother relies on case law concerning the assertion of jurisdiction over a child, not the removal from custody. (See, e.g., *In re J.M.* (2019) 40 Cal.App.5th 913, 921 ["a juvenile court must find the risk of harm exists *at [the] time of the jurisdiction hearing* to take jurisdiction over the minor"]; *In re J.N.* (2010) 181 Cal.App.4th 1010, 1023 [dependency jurisdiction is not authorized based on a single incident resulting in physical harm absent current risk]; *In re David M.* (2005) 134 Cal.App.4th 822, 830 [finding dependency jurisdiction unwarranted where harms to children were "merely speculative"], abrogated on other

grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628.)[8] Mother has not challenged the juvenile court's assertion of jurisdiction over her children, therefore the cases are irrelevant.[9]

Mother also relies on *In re Steve W.* (1990) 217 Cal.App.3d 10, 22, for the proposition that "speculation about the mother's possible future conduct is not even sufficient to support a finding of dependency much less removal of the physical custody of the child from the parent." *Steve W.* is distinguishable. In that case, the juvenile court removed a child from the custody of his mother after the father killed the child's half brother. The mother had begun counseling, was living in an adequate apartment and was self-supporting. In addition, she had taken appropriate steps to prosecute the father, who was incarcerated, and expressed a clear desire not to have anything to do with him. The *Steve W.* court found that the court's speculation that she would resume her relationship with the father, or enter a new relationship with yet

---

[8] To the extent that mother argues that dependency jurisdiction in this matter is based on a single incident, we disagree. The juvenile court was permitted to consider the family's dependency history, the children's allegations regarding mother's drinking and drug use, mother's failure to address these concerns, and mother's failure to cooperate with DCFS in determining that jurisdiction was appropriate here.

[9] Mother also cites *Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, 1070, discussing the denial of reunification services to a parent due to her political beliefs and activities, and concluding that such reasoning was based "on the minors' perceptions of risk rather than actual evidence of risk." (*Ibid.*) The court concluded that such speculative risk was insufficient. The case is irrelevant, as this matter does not involve a denial of reunification services.

another abusive type of person, was "little more than speculation" and did not suffice to support removal.  (*Ibid*.)

Here, in contrast, it was mother's own behavior that endangered her children.  Mother failed to acknowledge or address her actions or the substance abuse problems that led to her reckless behavior and car accident.  The juvenile court was not merely speculating when it found that there remained a substantial danger to the children's safety and well-being if left in her care.

Mother's reliance on *In re Drake M.* (2012) 211 Cal.App.4th 754 is also misplaced.  Preliminarily, we note that *Drake M.* involved a challenge to a jurisdictional finding, and the juvenile court's jurisdictional findings are uncontested in this matter.  Mother argues that the record does not support a finding that mother suffered from substance abuse issues.  She cites *Drake M.* for the proposition that lawful use of marijuana does not support a finding of substance abuse absent a medical opinion or a diagnosis meeting the criteria set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM).  (*Drake M.*, at p. 766.)  Mother argues that DCFS did not present either type of evidence in this matter.  We note that subsequent case law has confirmed that a parent does not need to meet the criteria for substance abuse set forth in the DSM in order for a juvenile court to properly find the parent's substance abuse renders the parent unfit to care for a young child.  (See *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 725; *In re Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1218-1220.)

Contrary to mother's position, there is evidence in the record that mother suffered from substance abuse issues.  Mother had a prior dependency case that was initiated in part due to her

substance abuse issues. Mother's children all attested to mother's use of marijuana and alcohol. B.G. reported that mother was addicted to marijuana, and Aubrey reported that mother's drinking had increased during the pandemic. Mother's reckless acts of stealing a car and driving while under the influence of a substance—with her children in the car without seat belts —is further evidence that mother's substance use was interfering with her ability to safely parent her children. Further, the juvenile court did not assume jurisdiction solely because of the mother's substance use.

Mother failed to acknowledge responsibility for her actions and failed to cooperate with DCFS. She did not consistently drug test and was unwilling to complete programs approved by DCFS and necessary to help ensure the safety of her children. She refused to speak with a social worker and rescinded her permission for release of information about her treatment. The juvenile court justifiably considered mother's actions and attitude during the pendency of the matter in declining to place the children in mother's care.

Mother attempts to distinguish this case from *In re M.R.* (2017) 8 Cal.App.5th 101. In *M.R.*, DCFS filed a dependency petition after learning that the mother had been arrested for driving under the influence of alcohol with her two children in her car, not properly restrained by seat belts. The parents contended that the one-time incident was insufficient to support jurisdiction, and the *M.R.* court disagreed. The court noted that the mother minimized her actions, and the parents' acceptance of responsibility seemed to worsen, rather than improve, as the dependency proceedings progressed. (*Id.* at p. 109.) Mother argues that this case differs from hers because here mother had

her criminal case successfully dismissed, had provided negative tests, and had completed programs approved by the criminal court. However, like in *M.R.*, there was also evidence that mother seriously minimized her actions. In addition, as in *M.R.*, mother became less cooperative as the matter progressed in the dependency court. The juvenile court was entitled to consider these factors in determining that there was a substantial danger to the children's well-being in mother's care.

Finally, mother argues that the record showed there were reasonable means to protect the children short of removal from mother's care. Mother points out that she had consistently visited her children up until the time of the disposition hearing without incident or concern. The children wanted to return to her care. Mother argues that reasonable means to protect the children existed, such as family preservation services, unannounced visits, and drug tests. Mother argues that the children were old enough to voice any concerns.

We find that the evidence supported the juvenile court's decision that no reasonable means existed short of removal to protect the children. Mother was not compliant with DCFS. Mother told DCFS an implausible story to explain the car accident involving her children. She tested positive for marijuana and missed many drug tests. When DCFS attempted to interview mother and father about the allegations in the petition regarding Aubrey, mother refused to provide a statement and referred the social worker to her attorney. Mother rescinded her release of information from her therapist, so mother's treatment plan could not be confirmed nor could DCFS confirm mother's progress demonstrating insight into child safety issues. Mother's therapist reported that after three sessions, no progress

could be reported due to lack of attendance. Given mother's lack of cooperation with DCFS, the juvenile court was justified in determining that no reasonable means existed short of removal to protect the children.

In sum, there existed clear and convincing evidence that there was a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being, and no reasonable way to protect the children short of removal from mother's home.

## II. Duty of Inquiry under ICWA

Mother contends that if the court does not reverse the order of removal, a remand is still necessary because the juvenile court's finding that ICWA did not apply was not supported by substantial evidence. Specifically, mother contends that DCFS and the court failed to make inquiry of mother's relatives and father's relatives. Mother argues that the error was a continuing violation under federal and state ICWA law because the juvenile court and DCFS both have a continuing duty to inquire whether the children may be Indian children. DCFS concedes that the record does not demonstrate that DCFS interviewed maternal or paternal relatives regarding the children's possible status as Indian children.

DCFS failed to fulfill its statutory duty of initial inquiry by not asking these extended family members about the children's possible Indian status. The failure to do so was error. We conclude, however, that the error was not prejudicial, given the parents' disclaimer of any knowledge of Indian ancestry and the absence of any indication in the record that there was readily obtainable information likely to bear meaningfully upon whether

23

the children are Indian children.  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744 (*Benjamin M.*).)

### A.    *Applicable law and standard of review*

ICWA and related California statutes reflect the Legislature's intent "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families."  (25 U.S.C. § 1902; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.)  An "Indian child" is defined as any unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a), (b).)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case.  These requirements are sometimes collectively referred to as the duty of initial inquiry." (*Benjamin M., supra*, 70 Cal.App.5th at p. 741.)  "The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).)  The court and child welfare department "have an affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child.  (*Ibid.*)

Under California law, the child welfare department's initial duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party

24

reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

The juvenile court must also inquire at each participant's first appearance in court whether the participant knows or has reason to know that the child is an Indian child. (§ 224.2, subd. (c).) In addition, the juvenile court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child. (§ 224.2, subd. (c).)

If the "initial inquiry creates a 'reason to *believe'* the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' ([§ 224.2], subd. (e), italics added.) [I]f that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

Neither the duty of further inquiry nor the ICWA notice provisions are at issue here because no one contends there is reason to know the children are Indian children. We review the juvenile court's ICWA findings for substantial evidence. (*In re D.N.* (2013) 218 Cal.App.4th 1246, 1251.) Deficiencies in ICWA inquiry may be deemed harmless error. (*Ibid.*)

### B. *No prejudicial error*

Mother's ICWA challenge is based on DCFS's failure to ask extended family members (both maternal relatives and father's relatives), about potential tribal membership.[10] The statutory duty to ask extended family members about a child's possible Indian heritage is imposed by California law on child welfare agencies only. (§ 224.2, subd. (b).) Federal law imposes no such duty. (*In re S.S.* (2022) 75 Cal.App.5th 575, 581; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069.) The failure to inquire of extended family members accordingly is an error under state law only. Under California law, we may not reverse unless we find that error was prejudicial. (Cal. Const., art. VI, § 13; *Benjamin M., supra*, 70 Cal.App.5th at p. 742.)

In determining whether the failure to conduct a proper ICWA inquiry was prejudicial, several appellate courts have held that reversal is warranted only when the record indicates there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child. (*Benjamin M., supra*, 70 Cal.App.5th at p. 744; *In re A.C.* (2022)

---

[10] Mother initially contended that DCFS failed to inquire of father. However, the record shows that DCFS did inquire of father, who filed an ICWA-020 form denying Indian ancestry, and was present and represented by counsel at the September 2, 2020 hearing when the juvenile court noted that ICWA did not apply.

75 Cal.App.5th 1009, 1017 [applying *Benjamin M.* court's standard for prejudice]; *In re Darian R.* (2022) 75 Cal.App.5th 502, 509 [same]; *In re S.S., supra*, 75 Cal.App.5th at p. 581 [same].)

The courts in *In re Antonio R.* (2022) 76 Cal.App.5th 421, 435-436 (*Antonio R.*), and *In re H.V.* (2022) 75 Cal.App.5th 433, 438 (*H.V.*), adopted different standards, holding that the DCFS's failure to interview extended family members during its initial ICWA inquiry was prejudicial error and therefore either (1) reversible per se (*H.V.*) or (2) above such a low bar for prejudice that it was reversible (*Antonio R.*). In *Antonio R.,* the parents both denied knowledge of any Indian ancestry. DCFS spoke with a paternal great-grandmother, who also denied knowledge of any Indian ancestry. The Department did not inquire about possible Indian ancestry with any maternal extended family members, including the maternal grandparents who were designated as the prospective adoptive parents, and maternal aunts and a maternal uncle who were present at the disposition hearing. The court in *Antonio R.* concluded that the failure to do so was prejudicial error.

In *H.V.*, the only person asked about possible Indian ancestry was the minor's mother, who filed an ICWA-020 form denying knowledge of any Indian ancestry and informed the juvenile court that the minor's alleged father (who did not appear) had no Indian ancestry. Although DCFS interviewed the minor's maternal great-grandmother and maternal great-grandfather, the record did not indicate whether the social worker asked any of these relatives about the minor's possible Indian ancestry. The court in *H.V.* concluded that the failure to do so was prejudicial and reversible error.

27

We decline to adopt the standard applied by the courts in *Antonio R.* and *H.V.*  We apply instead the standard for prejudicial error articulated by the court in *Benjamin M., supra*, 70 Cal.App.5th 735.

The record in this case reveals no readily obtainable information that was likely to bear meaningfully on whether the children were Indian children, and mother does not assert that such information exists.  Both mother and father told the social worker that they had no knowledge of any Indian ancestry.  Both mother and father filed ICWA-020 forms stating they had no Indian ancestry to their knowledge.  Both mother and father appeared at the detention hearing at which the juvenile court found, based on the parents' representations, that it had no reason to know that ICWA applied.  There is no reason to believe that the parents' extended families, with whom the parents were in close contact, were withholding any relevant information.  There is no other information in the record suggesting that further inquiry would have revealed potential Indian ancestry.  In short, the deficiencies in inquiry are harmless error in this case.

*Benjamin M., supra*, 70 Cal.App.5th 735 and *In re Y.W.* (2021) 70 Cal.App.5th 542 (*Y.W.*), on which mother relies, are factually distinguishable.  The father in *Benjamin M.* never appeared in court and was never asked whether he had reason to believe the subject minor was an Indian child. (*Benjamin M.*, at p. 744.)  The child welfare agency never asked the father's brother and sister-in-law, whom the agency contacted in an effort to locate the father, about the minor's possible Indian ancestry.  The court in *Benjamin M.* noted that the father's brother's knowledge of his own Indian heritage was likely to bear

28

meaningfully on the father's status. (*Id*. at p. 745.) Here, in contrast, both mother and father appeared in the juvenile court, both filed ICWA-020 forms denying any knowledge of Indian ancestry, and both denied knowledge of any Indian ancestry.

In *Y.W., supra*, 70 Cal.App.5th 542, the mother, who was adopted, filed an ICWA-020 form stating she had no knowledge of Indian ancestry. The social services agency interviewed the adoptive maternal grandmother, who did not know whether mother's biological family had any Indian ancestry. The adoptive maternal grandmother told the social worker that she knew the name of mother's biological father but had no additional information about him or his relatives. The adoptive maternal grandmother further stated she could obtain contact information for the mother's biological maternal aunt. The agency never followed up or sought to obtain further information about the mother's biological parents. (*Id*. at p. 549.) The court in *Y.W.* held that the agency's failure to do so was prejudicial error. (*Id*. at pp. 552-553.) In this case, in contrast, neither mother nor father was adopted, thus there was no reason to believe they were unaware of their biological ancestry.[11]

On the record presented here, we cannot conclude that the DCFS's failure to ask mother's relatives and father's relatives

_____

[11]     In *In re A.C., supra*, 75 Cal.App.5th at page 1017 the court found DCFS's failure to interview extended family prejudicial because the mother, as a former foster child, may not have known her cultural heritage, and because a detention report indicated that A.C. may have been an Indian child with no followup on that representation. Under those circumstances, the parents' denial of Indian ancestry was insufficient to dispel prejudice from DCFS's failure to inquire of extended family. No such circumstances exist in this case.

about the children's Indian ancestry was prejudicial error.  This is particularly true in this case because the matter has been transferred to San Bernardino County for further proceedings.  As set forth above, the duty under ICWA is a continuing one. The parties are instructed to inform the court of any additional information bearing on the children's status under ICWA.  (25 C.F.R. § 23.107(a); Welf. & Inst. Code, § 224.2, subd. (c).)  Thus, the parties remain under a continuing obligation to inquire into the children's Indian status throughout the pendency of the matter and comply with the notification provisions if necessary. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 12 ["the juvenile court's [initial] determination of ICWA's inapplicability . . . had no effect on its ongoing inquiry and notice obligations under sections 224.2 and 224.3(a)"].)

## DISPOSITION

The judgment and removal order are affirmed.

_____
CHAVEZ, J.

We concur:

_____
ASHMANN-GERST, Acting P. J.

_____
HOFFSTADT, J.

30